UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANTHONY G. FOOTE, | ) | Case No. 4:19-CV-01958 |
|  | ) |  |
| Plaintiff, | ) | JUDGE OLIVER |
|  | ) |  |
| -vs- | ) | MAGISTRATE JUDGE |
|  | ) | CARMEN E. HENDERSON |
| COMMISSIONER | ) |  |
| OF SOCIAL SECURITY, | ) |  |
|  | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) |  |
|  | ) |  |

**I. Introduction**

Plaintiff, Anthony G. Foote ("Foote" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On May 19, 2014, Claimant filed applications for SSI and DIB, alleging disability beginning January 23, 2014, due to head injury, depression, and anxiety following injuries sustained in a motor vehicle accident. After his applications were denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing on August 25, 2016. (ECF

No. 17 at 3-43).  On March 6, 2017, the ALJ issued a decision denying Claimant's applications for benefits. (ECF No. 12 at 136-159). The Appeals Council granted Claimant's request for review and subsequently remanded the matter to the ALJ for further proceeding.  (ECF No. 12 at 160-164).  A second hearing was held before the same ALJ on May 3, 3018, at which Claimant again testified as well as a VE. (ECF No. 12 at 47-81). On June 19, 2018, the ALJ issued a decision finding Claimant not disabled because he could perform a significant number of other jobs in the national economy.  (ECF No. 12 at 18-46). Claimant filed a Request for Review, which the Appeals Council denied, making the ALJ's decision the final decision of the Commissioner. (ECF No. 12 at 7).

Claimant filed the instant case seeking a review of the Commissioner's decision (ECF No. 1), and the Commissioner filed the administrative record on November 12, 2019 (ECF No. 12) and the supplemental transcript on February 19, 2020 (ECF No. 17). This matter is ripe for consideration.  (See ECF Nos. 13 and 18).

Claimant raises two issues on appeal. First, whether the ALJ gave proper weight to Claimant's treating psychologist Dr. Dennis McArthur and his treating neurologist Dr. Karla Madalin. Second, whether the ALJ failed to consider testimony received at the second administrative hearing, thus depriving Claimant of his constitutional right to due process and the right to a full and fair hearing.[1]

---

[1] Claimant also asserted that the transcript of the proceedings was incomplete in that it failed to include the transcript from the first administrative hearing. The Commissioner cured this error by filing a supplement to the transcript on February 19, 2020. (ECF No. 17). Accordingly, the Court now has the complete administrative record and is able to determine whether the ALJ's decision is supported by substantial evidence.

## III. Background

### A.  Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> At the initial hearing, the claimant testified that he was involved in a work-related accident on January 23, 2014, and that he has not been able to work since that time. Specifically, he testified that he was involved in a motor vehicle accident while driving a truck and that he lost consciousness. He testified that he now has residual nausea, headaches, blackouts, and seizures and that such symptoms can be triggered by being in a vehicle, bright lights, sudden movements, and watching television.  Specifically, he testified that, three times a week, he has to lay face down on a pillow because he feels like he is on a ride swinging in circles.  He also testified that, two to six times a month, he blacks out and gets the shakes. He testified that he has injured himself during these occasions, causing a black eye and split lip. He also endorsed severe neck pain, severe headaches, and loss of balance/dizziness when looking side to side or up. Overall, he estimated that he lays down 5-6 hours in a day. He testified that he has been prescribed various medications for his symptoms, but that nothing has worked.
>
> The claimant also endorsed depression and anxiety and testified that he sees a counselor and is prescribed medications for his mental symptoms.  However, he testified that he has difficulties leaving his home and sometimes does not make his doctor's appointments.  He endorsed anxiety where there are lots of people and testified that he tried to go on a fishing trip last year, but that after about thirty minutes he was ready to go home. He also endorsed problems with his memory and testified that he often forgets why he went into a room and that he completely forgets what people tell him within five minutes. Further, when specifically questioned about his drug use, the claimant testified that he uses edible marijuana once a month for his nausea.

(ECF No. 12 at 30).

### B.  Relevant Medical Evidence

Foote claims disability related to an injury to his head, anxiety, and depression. The ALJ summarized Claimant's health records and symptoms as follows:

Specifically, a cervical spine CT performed several days after the claimant's motor vehicle accident in January 2014, demonstrated only "mild" spondylosis, but no evidence of fractures or listhesis, normal body heights and intervertebral disc spaces, no soft tissue swelling, and no evidence of acute compression (Exhibit 2F/45). From that time, through December 2015, physical examinations routinely showed no musculoskeletal tenderness and a full and painless range of motion in the spine and all four extremities (Exhibits 2F, 6F, 7F, 8F, 12F, 16F, l7F, 19F, 20F, 21F, and 23F). In December 2015, he was assessed with moderate cervical tenderness and was assessed with cervicalgia and cervical radiculopathy, for which he was referred to physical therapy (Exhibits 20F and 21F). He participated in seven physical therapy sessions for neck pain and stiffness from January 2016 through May 2016, during which time he reported improvement in his symptoms (Exhibit 19F). In July 2016, he was discharged from physical therapy, due to no shows, which indicates that the claimant believed he no longer needed physical therapy for his neck pain and stiffness (Exhibit 19F).

A few weeks after the claimant's motor vehicle accident, he was assessed with whiplash, but there is no evidence of any specific treatment or limitations related to this one-time assessment (Exhibit 6F/6). Further, subsequent to his motor vehicle accident, the claimant has reported a few syncopal or blackout episodes after bending over; however, as discussed below, neurological testing has been negative, and the claimant's neurologist attributed such episodes to postural hypotension, for which the claimant has not received any specific treatment (Exhibits 1OF and 12F). Additionally, in February 2016, the claimant was assessed with convulsive syncope, due to his reports of unwitnessed seizure activity, but as discussed below, neurological testing has been normal, and there is no evidence of any limitations independent from his severe impairments discussed below (Exhibit 21F/4).

Additionally, while the claimant has been assessed with insomnia and sleep disorder on a few occasions, due to his complaints of poor sleep and daytime sleepiness, sleep studies performed in March 2015, were normal (Exhibits 1F/10; 6F/6, 11; 7F/12 13F/32). Further, the claimant is consistently assessed as alert, awake, and fully oriented (Exhibits 1F, 5F-7F, 12F, 13F, 16F, l7F, and 21F).

The claimant was treated for acute bronchitis/acute sinusitis and otitis media in June of 2015, by his primary care physician, with no

evidence of any residual complaints or significant treatment (Exhibit 13F/12, 16).

The record also reflects various minor assessments of hyperlipidemia, farsightedness, hypercholesterolemia, streptococcal pharyngitis and heartburn; however, such conditions have been conservatively treated and there is no evidence of [any] independent functional limitations related to these conditions (Exhibits 1F/7, 8, 10; 21F/3, 7; and 26F/7).

Moreover, although the claimant did not allege disability based on obesity, the undersigned has considered the claimant's body habitus and its effect in causing or contributing to the claimant's other impairments. The evidence reflects that the claimant is 5'9" and weighs approximately 235 pounds, a body habitus that may be reasonably anticipated to produce or contribute to symptoms of back or other musculoskeletal pain, and to generally limit mobility and stamina (Exhibits 1F/7; 2F/39; 16F/4; 20F/13; and 21F/32). The undersigned has fully considered the claimant's obesity and any related limitations in assessing the claimant's residual functional capacity determination (SSR 02-lp). The claimant's obesity is considered non-severe for the purpose of this decision, as there is no evidence of any independent functional limitations related to this condition.

(ECF No. 12 at 24-25).

## C. Opinion Evidence at Issue

1. Karla Madalin, M.D. – April 2017 and April 2018

In April 2017, following two visits with Foote, Madalin completed a Headaches Medical Capacity Questionnaire form. (ECF No. 12 at 903-906). Madalin opined that Foote would need unscheduled breaks two to three times a week for 30 to 60 minutes each time and would need to sit still or lie down due to symptoms from his headaches. Additionally, Madalin opined that Foote could tolerate a low stress job but would likely be absent from work more than four days per month. Madalin opined that Foote could not drive or operate heavy machinery nor climb ladders. (ECF No. 12 at 905).

The ALJ gave Madalin's opinion little weight citing the length of treatment with Foote as well as the opinion relying "heavily upon the subjective allegations of the claimant" rather than providing any "rationale or citations to objective medical evidence". (ECF No. 12 at 36). The ALJ found that the opinion was "grossly out of proportion with respect to the records available at that time and her own examination findings." (ECF No. 12 at 36).

A year later Madalin completed a second Headaches Medical Capacity Questionnaire form. (ECF No. 12 at 994-997). Madalin opined that Foote would need unscheduled 30 to 60-minute breaks once a week and would need to sit still or lie down during these breaks due to symptoms from his headaches. (ECF No. 12 at 997). Additionally, Madalin opined that Foote could tolerate a low stress job but would likely be absent from work more than four days per month. Madalin opined that Foote could not drive or operate heavy machinery nor climb ladders. (ECF No. 12 at 997).

The ALJ gave this opinion partial weight explaining that Madalin "fail[ed] to explain many of her limitations" and "fail[ed] to explain the apparent inconsistency between the number of headaches/migraines she [assessed] the claimant to experience in any given week/month, etc." Additionally, the ALJ stated that Madalin gave "no explanations or citations to the record regarding why she assess[ed] that [ ] claimant will miss more than four workday [sic] per month because of his impairments or treatment." (ECF No. 12 at 36-37). The ALJ further explained that Madalin had only examined Foote on five occasions and that the "limitations assessed by Dr. Madalin appear to be out of proportion with the overall record[.]" (ECF No. 12 at 37).

6

### 2. Dennis McArthur, Clinical Psychologist – August 4, 2016

On August 4, 2016, McArthur completed a Mental Health Medical Source Statement form on claimant. (ECF No. 12 at 843-846). McArthur opined that Foote has extreme limitations in maintaining social functioning and marked limitations in his activities of daily living and his concentration, persistence, or pace. (ECF No. 12 at 845). McArthur opined that Foote's mental health concerns would likely cause him to miss two or more days per month. (ECF No. 12 at 846). He also opined that even a minimal increase in mental demands or change in work environment could cause Foote to decompensate. (ECF No. 12 at 846).

The ALJ gave McArthur's opinion little weight explaining that:

> While Mr. McArthur is a treating psychologist, his opinion that the claimant has marked to extreme mental limitations and is incapable of even low stress work, is not consistent with his own treatment notes or the treatment notes of the claimant's other treating sources (Exhibits 18F, 22F, and 25F). Indeed, as noted above, while the claimant is occasionally assessed with a depression/anxious mood and affect, Mr. McArthur's treatment notes do not set forth complaints or assessments, which reflect any extreme or marked mental limitations. Indeed, it appears from Mr. McArthur's treatment notes that he may be overstating the claimant's mental conditions in order to attempt to assist the claimant in securing disability benefits. For instance, in October 2015, Mr. McArthur takes it upon himself to write to Dr. Cola (whom claimant was supposed to start treatment with) asking that Dr. Cola assist the claimant by writing a note on whether or not he could return to work (Exhibit 18F/24). The undersigned further notes that Mr. McArthur has not placed the claimant on any mental health type medications, yet he reports that the claimant has a GAF of 30, which would indicate that the claimant's behavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment. Neither the treatment notes of Mr. McArthur, nor the overall medical record supports limitations to this extent.

(ECF No. 12 at 35).

IV.     **The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

> 3.    The claimant has the following impairments, which are severe
> in combination:  post-concussion syndrome; vestibular dysfunction;
> migraines; traumatic brain injury, sequel; seizure; major depressive
> disorder; anxiety disorder; post-traumatic stress disorder ("PTSD");
> and adjustment disorder (20 CFR 404.1520(c) and  416.920(c)).
>
> 5.    After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but with the
> following nonexertional limitations:  He can sit/stand and/or walk
> about 6 hours each in an 8-hour workday.  All of his postural
> abilities are unlimited, except work should not require greater than
> occasional balancing or overhead reaching. The claimant should
> never climb ladders, ropes, or scaffolds or be exposed to unprotected
> heights, dangerous moving machinery, or heavy machinery. The
> claimant's work should not require driving a vehicle as a
> requirement of the job and he should be limited to routine tasks in
> occupations with an SVP of 2 or lower, performed in a low stress
> setting. This is defined as requiring no fast paced production
> requirements, such as fast paced assembly line work or high volume
> piecemeal quotas, having no more than occasional changes in work
> routine or work setting and which requires only occasional simple
> work related decision making. Finally, the claimant should have no
> greater than occasional interaction with co-workers, and no
> interaction with the general public as a requirement of the job.
>
> 10.  Considering the claimant's age, education, work experience,
> and residual functional capacity, there are jobs that exist in
> significant numbers in the national economy that the claimant can
> perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Based on his findings, the ALJ determined that Claimant has not been under a disability as

defined by the Social Security Act from January 23, 2014, through the date of the decision. (ECF

No. 12 at 39).

8

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Discussion

Claimant raises two issues on appeal. First, whether the ALJ gave proper weight to Claimant's treating physicians. Second, whether the ALJ failed to consider testimony received at the second administrative hearing, thus depriving Claimant of his constitutional right to due process and the right to a full and fair hearing.

### 1. Treating Sources[2]

Under the treating source rule, an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to

---

[2] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017.  *See* 20 C.F.R. § 416.927. Claimant filed his claim before the revision took effect.

any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

### A.  Karla Madalin

The first hearing regarding claimant's disability was held on August 25, 2016. (ECF No. 17). Roughly three weeks later, on September 13, 2016, Foote presented for consultation with neurologist Karla Madalin. (ECF No. 12 at 847-852). Madalin diagnosed Foote with having migraines without aura, post-concussion syndrome, and seizures. She prescribed a daily dose of Topiramate on a progressive scale to prevent Foote's migraines, ordered an EEG with sleep deprivation, and instructed Foote to follow up in three months. (ECF No. 12 at 858-60). Foote had an EEG on September 28, 2016 which showed "normal" results. (ECF No. 12 at 921). Foote next treated with Madalin nearly seven months later, on April 4, 2017. (ECF No. 12 at 930-932). Madalin stopped the dosage of Topiramate and switched Foote to Zonisamide at a progressive daily dose and instructed him to follow up in three months. (ECF No. 12 at 931). That same day, Madalin completed the Headache Questionnaire where she opined that Foote would be precluded from performing even basic work activities and need a break from the workplace during the times he had a migraine, which could occur 2-3 times a week and last 30-60 minutes. (ECF No. 12 at

905). Additionally, she opined that he was capable of low stress jobs and would likely be absent from work more than four days per month.

The ALJ gave this opinion little weight explaining that "Madalin appeared to have relied heavily upon the subjective allegations of the claimant when arriving at her opinion concerning his limitations. As she failed to provide any rationale or citations to objective medical evidence it is difficult to assess greater weight to her opinion, which seems grossly out of proportion with respect to the records available at that time and her own examination findings." (ECF No. 12 at 36).

Madalin's 2017 opinion was inconsistent with the substantial evidence in the record. At the time of claimant's first appointment with Madalin, he was taking no medication for seizures or headaches. (ECF No. 12 at 890). Although two MRIs of his brain in 2014 showed small infarctions, the results from a third MRI on March 1, 2016, showed stable and improved results. (ECF No. 12 at 921-22). Also, although claimant had previously complained of frequent headaches, his primary concern, and that of his treating physicians, seemed to be possible seizures. (*See, e.g*., records from Dr. Brocker at ECF No. 12 at 831-842, 877-888). The medical records as a whole do not support Madalin's opinion.

Moreover, Madalin's opinion was inconsistent with her own records. It is clear that Madalin reviewed the results of the 2016 MRI, which she described as "normal". (ECF No. 12 at 892). Moreover, Madalin noted claimant's recent and remote memory to be intact, with a normal attention span, normal concentrating ability, and his visual attention was not decreased. Her records likewise note normal comprehension, no difficulty with repetition, no difficulty naming common objects, and "intact" for expression. He had a normal motor exam,

with 5/5 strength, and normal coordination, but he was noted to have decreased toe and heel walking R and L; tandem unsteady. Madalin noted that Foote had a family history of migraine headaches and a history of post-concussion syndrome with persistent headaches, dizziness, memory and thinking difficulty following a head injury in January 2013.

Accordingly, substantial evidence in the record supports giving Madalin's 2017 opinion less than controlling weight.

Finally, the ALJ gave good reasons for giving Madalin's 2017 opinion little weight. The ALJ accurately evaluated the factors outlined in 20 C.F.R. § 404.1527(c)(2) and supported her explanation by specifically citing evidence in the case record. *See Gayheart*, 710 F.3d at 376. The ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. (citations and internal quotation marks omitted). The ALJ properly applied the treating source rule and permitted meaningful review of its application in her decision.

On April 19, 2018, Madalin completed a second Headache Questionnaire. (ECF No. 12 at 994-998). She again opined that Foote would need unscheduled 30 to 60-minute breaks once a week and would need to sit still or lie down during these breaks due to symptoms from his headaches. (ECF No. 12 at 997). Additionally, Madalin opined that Foote could tolerate a low stress job but would likely be absent from work more than four days per month. Madalin opined that Foote could not drive or operate heavy machinery nor climb ladders. (ECF No. 12 at 997). The ALJ gave this opinion partial weight. Substantial evidence supports this conclusion.

First, the record as a whole supports giving Madalin's opinion less than controlling weight. Since Madalin's 2017 opinion, Claimant had treated with Dr. Andy Beistel on 2 occasions:

October 25, 2017 and December 18, 2017. Beistel noted Claimant's cranial nerves were "grossly intact", his deep tendon reflexes were normal (2/4), and he had no focal neural deficits. (ECF No. 12 at 941). Beistel reported "appropriate affect, good eye contact, pleasant, comfortable and appropriate with the exam, normal thought process." (ECF No. 12 at 941). Claimant reported that although he has headaches, he is generally healthy with the exception for depression, anxiety, and changes in sleep habits. (ECF No. 12 at 941). Claimant reported to Beistel on December 18, 2017 that he "continues with occasional headaches" and "occasional dizziness" but the Toradol does help. (ECF No. 12 at 940). On March 6, 2018, Claimant had an MRI of his brain. (ECF No. 12 at 948-951). The findings showed no evidence of acute infarct or hemorrhage, extra-axial collection or dural venous sinus thrombosis. (ECF No. 12 at 949). Claimant also sought treatment with University Hospitals regarding the possibility of epilepsy on referral from Madalin. The University Hospitals records indicate claimant had a severe headache every 2-3 weeks and was doing better on medication. (ECF No. 12 at 1014, 1020). Accordingly, the record does not support Madalin's limitations.

Additionally, Madalin's own records do not support her opinion. From April 4, 2017, through April 19, 2018, Foote treated with Madalin twice: on July 11, 2017 and February 12, 2018.[3] The treatment notes from July 11, 2017 indicate improvement in Claimant's headaches and seizures with medication. (ECF No. 12 at 913). Madalin recommended a follow up appointment in six months. On December 15, 2017, Foote contacted Madalin's practice requesting a letter that he is under her care and unable to work. (ECF No. 12 at 923). Madalin

---

[3] The ALJ notes a treatment date of December 15, 2017. However, this medical record is merely a notation of a communication from claimant. (See ECF No. 12 at 923).

responded that she needs to schedule him for a follow up to "find out why he is unable to work." (ECF No. 12 at 923). Madalin next treated Foote on February 12, 2018. (ECF No. 12 at 908). At that appointment, claimant reported memory problems, passing out once a week, and having 1-2 headaches every 3 weeks with a severe headache every 2-3 weeks. (ECF No. 12 at 909). On March 6, 2018, Madalin contacted Claimant and expressed that although the MRI results had some minor abnormalities it was nothing concerning. The notes further explained that the MRI showed a few "white spots" on both sides of Claimant's brain, as well as a small area of previous bleeding on the left side, but that all of the findings can be caused by claimant's previous head injuries and "are not a cause for concern." (ECF No. 12 at 949).

Accordingly, the record supports the ALJ's decision to give Madalin's 2018 opinion less than controlling weight.

Finally, the ALJ gave "good reasons" for giving Madalin's opinion "partial weight". The ALJ explained:

> On April [19], 2018 Madalin indicated that the claimant has had one to two headaches every three weeks, which last all day, posterior occipital, with a reported severity of 10/10. She also stated that the claimant had two to three headaches per month that lasted several hours. She noted an EEG in epilepsy monitoring unit from April 2018 that was consistent with psychogenic nonepileptic seizures. Dr. Madalin indicated that the claimant had significant anxiety and depression. She opined that claimant would need an unscheduled break once per week for 30 - 60 minutes to sit or lie down quietly. She opined that he was capable of low stress jobs, but that he would be expected to miss more than four days per month, that the claimant was unable to drive, operate heavy machinery, or climb ladders. Dr. Madalin reported that during a recent visit in February 2018, 50% of

which was spent discussing his current situation[4], options, counseling and coordination of care (Exhibit 30F/3). During that examination Dr. Madalin administered the Montreal Cognitive Assessment (MOCA) to the claimant. She assessed a total score of 21/30. On the visuospatial/executive portion of the evaluation (which includes drawing a clock) the claimant scored 5/5 (Exhibit 30F/3).

On March 6, 2018, Dr. Madalin notified the claimant that the MRI of his brain showed some minor abnormalities, but nothing that was concerning. She noted that the findings could have been caused by his previous head injuries and were not a cause for concern (Exhibit 33F/l). The limitations assessed by Dr. Madalin appear to be out of proportion with the overall record and are only assessed with partial weight.

(ECF No. 12 at 35-37).

The ALJ accurately evaluated the factors outlined in 20 C.F.R. § 404.1527(c)(2) and supported her explanation by specifically citing evidence in the case record. *See Gayheart*, 710 F.3d at 376. The ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citations and internal quotation marks omitted). The ALJ properly applied the treating source rule and permitted meaningful review of its application in her decision.[5]

---

[4] "The record indicates she spent a total of 40 minutes with the claimant." (ECF No. 12 at 36, n.1).

[5] Despite giving Madalin's opinion partial weight, the ALJ incorporated her limitations to some extent. For example, the ALJ limited the claimant to work that includes a low stress setting and restricted him to routine tasks in occupations with an SVP of 2 or lower. These limitations in the residual functional capacity accommodate not only the claimant's allegations of headaches/migraines – despite the ALJ's determination that such symptoms were overstated and unsupported– but also the affects from his traumatic brain injury.

16

Accordingly, substantial evidence supports the ALJ's decision to give Madalin's opinions partial weight.

### B. Dennis McArthur, Clinical Psychologist – 8/4/2016

McArthur opined that Claimant was markedly limited in the area of activities of daily living, extremely limited in maintaining social functioning, and markedly limited in concentration, persistence or pace. (ECF No. 12 at 845). McArthur opined that Claimant's impairments would cause absenteeism at a rate of two or more days per month. (ECF No. 12 at 846).

Claimant states that the ALJ erred by failing to address McArthur's opinion that Claimant's mental health symptoms would cause him to be absent from work two or more days per month. (ECF No. 13 at 8). Claimant also asserts that the ALJ "bypassed the controlling weight analysis, failing to initially determine whether Dr. McArthur's opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques and then to determine whether they were not inconsistent with the other substantial evidence in the records." (ECF No. 13 at 8).

As an initial matter, "a treating physician's opinion is only entitled to such ... deference when it is a medical opinion." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013) (quoting *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x. 488, 492–93 (6th Cir. 2010)). "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—'[the ALJ's] decision need only 'explain the consideration given to the treating source's opinion.' " *Id*. (quoting *Turner*, 381 F. App'x. at 493 (quoting SSR 96–5p, 61 Fed. Reg. 34474)). "The opinion, however, 'is not entitled to any particular weight.'" *Id*. (quoting *Turner*, 381 Fed. Appx. at 493). Thus, McArthur's opinion as to Claimant's

absence from work is a conclusion for the ALJ to determine and is not a proper medical opinion entitled to particular weight. *See* 20 C.F.R. § 404.1527(d); *Johnson*, 535 F. App'x at 505.

Claimant asserts that the ALJ's decision fails to justify not giving McArthur's opinion controlling weight, instead bypassing the controlling weight analysis and moving straight onto providing "good reasons" for giving McArthur's opinion little weight. (ECF No. 13 at 15). The government counters that the ALJ's bypassing of the controlling weight analysis is harmless error because he addressed "the factors necessary for that analysis, including length and frequency of treatment, and her rejection was implicit[.]" (ECF No. 18 at 12, n.1). The court notes that such factors as pointed out by the government are "properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2) (listing seven specific factors to be applied when a treating-source opinion is not given controlling weight, including the general consistency of the opinion with the record as a whole). Before determining whether the ALJ gave "good reasons" for giving a treating source opinion certain weight, we must determine whether substantial evidence exists for giving the opinion less than controlling weight. To receive controlling weight, the treating source opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Blakley*, 581 F.3d 399, 406.

Substantial evidence supports the ALJ's decision to give McArthur's opinions less than controlling weight. First, McArthur's opinions are inconsistent with the record as a whole, which support only moderate to mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace. As the ALJ noted, the records show that

18

Claimant was routinely assessed as "alert, awake, fully oriented, pleasant, well-appearing, well-groomed, with intact insight and judgment, fair emotional insight, and good social judgment (Exhibits 1F, 4F, 5F, 6F, 7F, 9F, 13F, 18F, 20F, 21F, and 25F)." (ECF No. 12 at 33).  Additionally, in Claimant's Mental Health Clinical Summary from August 8, 2017, Claimant was noted to have good eye contact, oriented x 4, average mental abilities, fair emotional insight, good social judgment, cooperative attitude. (ECF No. 12 at 969). Although he displayed symptoms of depression and anxiety, his attention was normal, thought content unremarkable, and was not a risk to himself or others. (ECF No. 12 at 969). On April 26, 2018, Claimant underwent a Psychiatric Diagnostic Assessment at Comprehensive Behavioral Health Associates. (ECF No. 12 at 999).  The notes indicate that Claimant reported hallucinations and paranoia.[6] (ECF No. 12 at 1002).  Yet, he again appeared to have logical thought process, appropriate affect, and was cooperative, pleasant and calm with no reported impairments. (ECF No. 12 at 1002-1003). The ALJ also noted that although Claimant "had some impairment in his delayed recall for a few months after his accident, subsequently he has been routinely assessed with intact memory, attention, and concentration (Exhibits 6F, 7F, 12F, 16F, 17F, and 21F)." (ECF No. 12 at 33). Finally, the treatment notes from April 5, 2018 to May 10, 2018, provided by University Hospitals demonstrate that the Claimant's events are "most likely psychogenic". (ECF No. 12 at 1014). Upon exam, Claimant appeared "[a]wake, alert and oriented to person, time and place. Normal attention span and concentration. Fluent speech with normal naming, repetition and comprehension. Remote

---

[6] Claimant reported "he has seen shades and figures out of the corner of his eye, when looking there is nothing there. He also has been hearing noises around that house, like footsteps, thuds, etc. even though there is no one there." (ECF No. 12 at 1003).

memory intact. No difficulties with recent memory. Normal fund of knowledge, awareness of current events and able to provide full history." (ECF No. 12 at 1016). Accordingly, the medical records as a whole do not support the extreme limitations found by McArthur.

Second, McArthur's opinions are inconsistent with his own treatment records. Although McArthur notes that Claimant suffers symptoms of depression and anxiety, none of those symptoms support extreme or marked limitations. (*See* ECF No. 12 at 742-765, 863-865, 952-964). Notably, McArthur's records indicate that therapy is helpful to Claimant in treating his depression and anxiety. For example, when Claimant sought treatment with McArthur he was really just looking for someone with whom to talk. (ECF No. 12 at 753). The evidence that talk therapy helps Claimant deal with his depression and anxiety is consistent throughout McArthur's records. Absent, however, are indications of symptoms of the severity that give rise to the extreme or marked limitations opined by McArthur. Moreover, McArthur's own treatment notes following his opinion demonstrate that therapy is helping Claimant. For example, on March 12, 2018, McArthur wrote: "[Claimant] was deeply depressed today as the session started, but I must say at the end he was much more lively and animated and smiling. He acknowledged feeling that the session had been beneficial because it allowed him to ventilate a great deal." (ECF No. 12 at 952).

Accordingly, substantial evidence supports the ALJ's decision to give McArthur's opinion less than controlling weight.

Finally, the ALJ gave good reasons for giving McArthur's opinion little weight. The ALJ explained:

> Little weight is accorded to the medical source statement of Dennis McArthur (Exhibit 22F). While Mr. McArthur is a

> treating psychologist, his opinion that the claimant has marked to extreme mental limitations and is incapable of even low stress work, is not consistent with his own treatment notes or the treatment notes of the claimant's other treating sources (Exhibits 18F, 22F, and 25F). Indeed, as noted above, while the claimant is occasionally assessed with a depression/anxious mood and affect, Mr. McArthur's treatment notes do not set forth complaints or assessments, which reflect any extreme or marked mental limitations. Indeed, it appears from Mr. McArthur's treatment notes that he may be overstating the claimant's mental conditions in order to attempt to assist the claimant in securing disability benefits. For instance, in October 2015, Mr. McArthur takes it upon himself to write to Dr. Cola (whom claimant was supposed to start treatment with) asking that Dr. Cola assist the claimant by writing a note on whether or not he could return to work (Exhibit 18F/24). The undersigned further notes that Mr. McArthur has not placed the claimant on any mental health type medications, yet he reports that the claimant has a GAF of 30, which would indicate that the claimant's behavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment. Neither the treatment notes of Mr. McArthur, nor the overall medical record supports limitations to this extent.

(ECF No. 12 at 35). Additionally, the ALJ explained her analysis of the GAF score:

> Moreover, during the relevant time period, the claimant was assessed with Global Assessment of Functioning ("GAF") scores of 30 (indicative of a serious impairment in communication or judgment) to 55 (indicative of no more than moderate mental symptoms (Exhibits 4F, 5F, 11F, and 22F). The undersigned finds that the highest of these scores reflects the claimant's true baseline level functioning with appropriate treatment and absent any immediate stress factors that would cause a temporary decrease in the level of functioning. Indeed, when crafting the residual functional capacity, the undersigned is charged with determining the maximum abilities the claimant can do in spite of his mental impairments. The claimant's highest GAF score of 55, is more reflective of the claimant's maximum mental capabilities; as such, it is accorded great weight. Moreover, the claimant's lowest GAF scores are entirely inconsistent with the mental status examination findings detailed above.

(ECF No. 12 at 34). Finally, "[i]n concluding that the claimant has no more than mild to moderate mental symptoms" the ALJ noted "that the claimant's mental health treatment has been limited to intermittent counseling and medication management, with evidence of treatment non-compliance, and with no evidence of any inpatient care or emergent care. This evidence is inconsistent with the presence of any marked mental limitations." (ECF No. 12 at 28).

There is nothing deficient in the ALJ's explanation for why she gave McArthur's opinion little weight. She accurately evaluated the factors outlined in 20 C.F.R. § 404.1527(c)(2) and supported her explanation by specifically citing evidence in the case record. *See Gayheart*, 710 F.3d at 376. The ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citations and internal quotation marks omitted). The ALJ properly applied the treating source rule and permitted meaningful review of its application in her decision.

Although Plaintiff was described during various physical and mental health appointments as being tearful during the visits (ECF No 12 at 654, 658, 846-849, 1017) and was described during physical health appointments as being anxious, shaking, upset (ECF No. 12 at 733, 736-7375), these symptoms – nor the records therein – do not support the existence of marked or extreme limitations. Moreover, contrary to Claimant's assertion, Madalin's belief that his emotional factors greatly contributed to his intractable migraine headaches (ECF No. 12 at 904) and a note that his syncopal episodes were believed to be psychogenic non-epileptic events, perhaps related to his history of being abused (ECF No 12 at 1013-1015), are not evidence indicating the severity of the limitations opined by McArthur.

Accordingly, substantial evidence supports giving McArthur's opinion little weight.

### 2. Testimony from Second Hearing

In his second assignment of error, claimant argues that "the ALJ failed to properly consider plaintiff's testimony from the more current administrative hearing held on May 3, 2018, depriving plaintiff of his constitutional right to due process and the right to a full and fair hearing." (ECF No. 13 at 17). Specifically, claimant argues that although "the ALJ references plaintiff's testimony from the first hearing in her decision (Tr. 22, 24),  the summary of the hearing testimony in her current decision is identical to the summary of the  hearing testimony contained in her initial decision dated March 6, 2017.  (Tr. 140, 141-142.) As such, she does not appear to have considered any of plaintiff's testimony from the more current hearing, although he testified that his conditions had worsened." (ECF No. 13 at 17).

Here, the ALJ referenced evidence from the 2018 hearing on several occasions throughout her decision. The ALJ also discussed Claimant's subsequent reports of "persistent dizziness, nausea, headaches, poor sleep, and syncopal episodes with shakiness" (ECF No. 12 at 31), which were described in his 2018 testimony (ECF No. 12 at 31, 64-72). The ALJ also noted his reports of difficulty leaving his home due to anxiety, which was also mentioned in his 2018 testimony (ECF No. 12 at 34, 72). Claimant testified about his treatment with Madalin for his migraines (ECF No. 12 at 66), which the ALJ discussed extensively in her decision. Claimant testified about his confusion (ECF No. 12 at 60, 64, 68-69), the ALJ addressed this as well (ECF No. 12 at 28). Finally, the ALJ specifically referred to the vocational expert's testimony from the 2018 hearing. (ECF No. 12 at 38).

Accordingly, the substantial evidence demonstrates that the ALJ considered the testimony from Claimant's second hearing. Claimant's alleged error is meritless.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

DATED: 11/30/2020

_s/Carmen E. Henderson_
Carmen E. Henderson
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).